```
UNITED STATES DISTRICT COURT                ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JUAN PENA,                                  :
                                            :
                Petitioner,                 :   MEMORANDUM
                                            :   AND ORDER
        -against-                           :
                                            :   08-CV-3541 (JG)
UNITED STATES,                              :
                                            :
                Respondent.                 :
-------------------------------------------------------X
```

A P P E A R A N C E S :

    JUAN PENA
        # 63792-053
        FCI Loretto
        P.O. Box 1000
        Loretto, PA 15940-1000
        *Petitioner,* pro se

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
    By:   Roger A. Burlingame
        *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

        Juan Peña moves under 28 U.S.C. § 2255 to vacate the sentence of imprisonment I imposed after he pled guilty to heroin trafficking charges. For the reasons described below, the motion is denied.

## BACKGROUND

        All the arguments Peña makes in support of his motion concern the sentencing proceedings that ensued after Peña pled guilty to conspiracy to import heroin into the United

States. The guilty plea took place on November 30, 2006, and sentencing was originally scheduled for March 2, 2007. It was adjourned in February to April 27, 2007, and subsequently adjourned again at Peña's request to June 29, 2007.

On June 19, 2007, Salvador Delgado, Esq., filed a notice of appearance for Peña. He sought an adjournment of the sentencing in order to address some unspecified "issues which I believe may not have been fully addressed." Letter from Salvador Delgado, June 19, 2007, at 1. I denied the request. In an order entered on the docket on June 25, I noted that Peña's attorney at the time, Justin Levine, had not been relieved, and that I expected Levine to appear for the June 29 sentencing. On June 27, 2007, Delgado wrote another letter setting forth the issues he wished to address before Peña was sentenced, including Peña's cooperation with the government.

Peña did not want to be sentenced, and a government letter dated June 23, 2007 made clear why that was so. The prosecutor reported that after Peña's arrest, and before a cooperation agreement could be executed, Peña offered to help the Drug Enforcement Administration ("DEA") intercept an impending shipment of narcotics. He made proffer statements and agreed to assist the DEA to make significant seizures of drugs and new arrests. Unfortunately, Peña did the worst possible things a defendant can do in those circumstances. First, he lied in his proffers; according to the government, he "not only lied about his own criminal activity, but also about that of various co-conspirators." Letter from Roger A. Burlingame, June 23, 2007, at 2. Worse still, Colombian wiretap intercepts showed that Peña instructed a U.S.-based associate to contact one of his suppliers in Colombia and inform the supplier that Peña wanted to continue his drug dealing through the associate because Peña's phones were being tapped by law enforcement. Thus, the Colombian wiretaps revealed that Peña

2

wanted to import drugs behind the backs of the agents he was purportedly cooperating with. So Peña, who had been released on conditions in order to cooperate, was arrested again. At his request, he was allowed to proffer again, but when he did so "he continued to lie concerning his criminal history." *Id.* at 2 n.2.

On June 29 both Levine and Delgado appeared with Peña, but neither was prepared for sentencing. Levine reported that Peña blamed him for failing to procure a substantial-assistance motion pursuant to U.S.S.G. § 5K1.1 and would no longer talk to him. For his part, Delgado said he wanted "only a short time" – two to three weeks – to prepare for sentencing. Not wishing to visit upon Peña the consequences of having lawyers who were unprepared for sentencing, I agreed to adjourn the sentencing.

At that time, I also addressed preliminarily the "issues" set forth in Delgado's June 27 letter as requiring his attention (and thus warranting an adjournment). One was the need to "explore with the government the possibility of obtaining a 5K1.1 letter." Letter from Salvador Delgado, June 19, 2007, at 2. I informed Delgado that in light of the government's letter regarding Peña's purported cooperation, such a motion was not a even a remote possibility, and the government confirmed my impression. I further told Delgado that I would listen to his arguments regarding Peña's claims of cooperation, and that I could consider any such cooperation even without a government motion under the *Fernandez* case,[1] but that a futile effort to seek a government motion did not justify a sentencing adjournment.

Delgado also sought an adjournment on the ground that his client "was desirous of obtaining what is known as the safety valve reduction in his sentencing package." *Id.* at 1.

---

[1] *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006).

This was a reference to the two-level downward adjustment currently set forth in § 2D1.1(b)(11) of the Guidelines, which incorporates by reference the statutory grounds for safety valve relief from the mandatory minimum sentences.[2] I informed Delgado that the undisputed facts made Peña ineligible for the safety valve adjustment. Tr. June 29, 2007, at 2. Two features of Peña's case made safety valve relief hopeless. First, he had more than one criminal history point. Second, though there was a dispute about the *degree* of the proper aggravated role adjustment Peña deserved, there was no dispute that he deserved at least a two-level upward adjustment based on his role in the offense. Each of these facts disqualified him from safety valve relief from the mandatory minimum sentence and from the safety valve adjustment.[3]

Though those issues did not warrant an adjournment, Delgado was new to the case, and as mentioned above, it did not seem fair to Peña to require him to proceed to sentence without a prepared attorney. In addition, Delgado expressed a desire to bring to my attention a medical condition of Peña's wife, which in counsel's judgment would warrant leniency at sentencing. Thus, I adjourned the sentencing to July 20, 2007.

On that date, Delgado appeared for sentencing with his client, but he reported they were still not ready to proceed. They still "had not formulated objections" to the presentence report. Delgado claimed that he had not even received a copy of the presentence report until July 13, blaming an "encryption problem" in the computer of his predecessor counsel, Levine. Tr. July 20, 2007, at 3. When pressed about the forthcoming objections,

---

[2] Those requirements are set forth in 18 U.S.C. § 3553(f). They are repeated in U.S.S.G. § 5C1.2, which is cross-referenced by § 2D1.1(b)(11).

[3] The parties' agreement that Peña deserved a two-level role adjustment (rather than the four-level adjustment set forth in the presentence report) was accepted by the Court on August 3, 2007. Tr. August 3, 2007, at 3. That adjustment, pursuant to § 3B1.1(c) of the Guidelines, disqualified Peña from safety-valve eligibility pursuant to § 5C1.2(a)(4). The criminal history points disqualified him pursuant to § 5C1.2(a)(1).

4

Delgado mentioned only one: an objection to the four-level adjustment for role in the offense. This objection was actually a joint objection, as the government itself took the position (in the plea agreement and subsequently in court) that only a two-level adjustment was appropriate. Nevertheless, I granted another adjournment, to August 3, 2007.

Delgado filed a lengthy sentencing submission on July 31, 2007. It mentioned the parties' agreement to a two-level upward role adjustment and sought a criminal history departure, but otherwise did not address the Guidelines computation. It then set forth various reasons for a non-Guidelines sentence.

On August 3, 2007, the case was again called for sentencing. Delgado stated that he had reviewed the Presentence Report ("PSR") with the defendant orally and went over it "on a page by page, line by line basis." Tr. Aug. 3, 2007, at 2. Peña confirmed that this was the case. *Id.* Counsel then reported that Peña was sick because of a nauseating smell in the Metropolitan Detention Center ("MDC"). Peña was not "in a healthy enough condition, in the right frame of mind, to go forward with this sentencing today," I was told. *Id.* at 4.

Through Delgado, Peña also asked me to conduct "some kind of investigation" into Peña's claims that electrical cutoffs, power outages and water shortages at the MDC (which had caused Peña to feel ill) had occurred repeatedly. Counsel suggested the possibility that the facility might need to be closed down. I responded that any injunctive relief directed toward the MDC would require notice to the facility and an opportunity to be heard, and invited counsel to proceed expeditiously by requesting an order to show cause directed to the MDC. Counsel assured me he would "be providing some paperwork in the near future." Tr. Aug. 3, 2007 at 9. In light of Peña's claim of illness, I put the sentencing over to August 22, 2007.

Counsel did not seek an order to show cause directed to the MDC. Rather, the day before the scheduled sentencing, he filed a "Notice of Motion For Downward Departure Due to Harsh Conditions." Attached to the notice of motion was an affidavit by Peña that described horrific living conditions in his unit at the MDC. Among the numerous assertions in the affirmation were:

- The toilets are often clogged and "human waste just sits there and develops a nauseating stench" for "up to 4 to 6 weeks" before they are repaired.
- "The water supply is often interrupted or simply non-existent for long stretches of time …"
- "[A]nts and flies are ever present …"
- "Vermin (rats and mice) … run throughout the entire unit …"
- Rodent waste is "often found" in the kitchen near where food is stored and prepared.

In my view, at that time and today, these complaints were not plausible, though not because there are never problems with the conditions of confinement at the MDC. To the contrary, on multiple occasions over the years I have ordered its Warden to show cause why relief from such problems (most of which have related to delays in providing inmates with prescribed medications or needed medical treatment) should not be ordered. Rather, Peña's claims lacked plausibility because he was the only inmate who made them. The Federal Defenders and the other defense attorneys who represent defendants in this district do an excellent job of bringing their clients' subpar conditions of confinement to my attention, either by order to show cause or via a request for informal assistance. If Peña's claims regarding the squalid conditions at the MDC were even partially true, he would not have been the only one asserting them, and during that period of time I heard of no other such complaints.

Notwithstanding my skepticism of Peña's affidavit about the conditions in the MDC, I required the warden to respond to them in writing. His response, which is docket entry

113 in the case, contradicted all of the essential allegations leveled by Peña. In some circumstances further inquiry, including an evidentiary hearing, might be warranted before resolving such factual disputes, but this case did not present those circumstances, as my response to the warden's letter (docket entry 114) made clear to all concerned.

On August 22, 2007, the case was again called for sentencing. At the outset, Delgado said that a few minutes before the sentencing, Peña told him he was "continually faint[ing] inside the" MDC and did "not feel up to the rigors of the sentencing proceeding." Tr. Aug. 22, 2007, at 2. I denied the request because I didn't credit it; as I observed at the time, Peña looked fine. *Id.* at 3.

There ensued a longer than usual sentencing proceeding. Delgado again stated, and Peña agreed, that he had gone over the PSR "orally page by page, line by line" with his client. Tr. Aug. 22, 2007, at 4. The defendant himself addressed me at length. *Id.* at 10-17; 25-26; 31-33. The prosecutor, who had attempted to enlist Peña's cooperation, reported among other things that Peña "may be the most spectacular and consistent liar I've come across in my job." *Id.* at 18. Delgado sought a *Fatico* hearing on the circumstances of Peña's cooperation; I denied that motion as belated, and, in any event, without merit.

I observed again before imposing sentence that "[w]hatever else could be said about this defendant who stands before me today he is not sick. He's fine. His health is fine." *Id.* at 27. I then denied the motion for a downward departure on the ground that I did not credit Peña's complaints about his conditions of incarceration, and in any event those conditions would come to an end with his post-sentence designation to a facility in which he would serve his sentence. I sentenced Peña to 235 months in prison, a Guidelines-range sentence.

DISCUSSION

Peña argues that the sentence should be set aside because: (1) I should have postponed the sentencing proceedings yet again due to his alleged illness on the day he was sentenced; (2) Delgado failed to have a certified translator review the PSR with Peña; (3) I wrongfully denied his motion for a *Fatico* hearing; (4) the PSR was inaccurate. As I explain below, each of these claims is meritless.

As for Peña's argument that I should have postponed the sentence because of the alleged illness, his repeated attempts to put off the sentencing, his established history of lying to law enforcement, and his healthy appearance at the hearing severely undercut the credibility of that claim. Evaluating Peña's challenge to his sentence against that backdrop, I reject it. It is true, as Peña argues, that I am not a doctor, and I am not capable of making medical diagnoses. But a judge does not always need to be a doctor to determine that a defendant is feigning illness in an effort to adjourn a legal proceeding. Based on my personal observations of Peña, who spoke at great length during the sentencing, and the history of the case, I made the determination that he was fit to proceed. Nothing that has been brought to my attention in the meantime alters my view. Accordingly, I conclude that he is not entitled to collateral relief from his sentence on this ground.

Peña's contention that his lawyer ought to have provided a certified translator to review the PSR with him, or translate it for him in writing, also provides no basis for vacating the sentence. At sentencing, the court "must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report." Fed. R. Crim. P. 32(i)(1)(A). When I did so, Peña confirmed that Delgado had translated the PSR for

him orally, and that they had gone over it together "page by page, line by line."[4] Tr. Aug. 3, 2007, at 2. By translating the PSR for Peña orally and ensuring that he understood it, Delgado discharged his duty to provide effective assistance of counsel. *See, e.g., Sanders v. United States*, 130 F. Supp. 2d 447, 449 (S.D.N.Y. 2001) (rejecting petitioner's claim that the failure to provide him with a written translation of the PSR constituted ineffective assistance of counsel).

Third, Peña's claim that he should have been granted a *Fatico* hearing on the issue of his cooperation with the government also fails. There was no "factor relevant to the sentencing determination [that] was reasonably in dispute," so an evidentiary hearing would have been pointless. *See* U.S.S.G. § 6A1.3. A district court's authority to review a prosecutor's refusal to make a substantial-assistance motion is limited to cases in which the refusal was based on an unconstitutional motive. *Wade v. United States*, 504 U.S. 181, 185-86 (1992). A "claim that a defendant merely provided substantial assistance will not entitle a defendant to a remedy or even to discovery or an evidentiary hearing." *Id.* In any event, the record makes plain that Peña tried to "double-cross" the government during the course of his purported cooperation, making the prosecutor's decision not to file a substantial-assistance motion an eminently reasonable one.

As for the fourth ground, Peña has not identified anything in the PSR to support his claim that I relied on an inaccurate PSR to sentence him. At the sentencing, the Probation Officer did note that Probation was "still on the fence" as to whether proposed amendments to the criminal history Guideline would have affected Peña's Guidelines range. Having researched the matter, I concluded then, and agree now, that they did not. Tr. Aug. 22, 2010, at 5.

---

[4] There is no indication that Delgado's translation was inaccurate in any way.

Moreover, the proposed amendments were not effective at the time of Peña's sentencing, so any disagreement between the parties as to their hypothetical application to Peña was immaterial to the question of the appropriate sentence.

## CONCLUSION

I have considered all of Peña's arguments and found each to be meritless. Accordingly, the § 2255 motion is denied. As the petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: August 17, 2010
Brooklyn, New York